(56 South. 355.)

No. 18,322.

BUHLER v. MORGAN'S L. & T. R. R. & S. S. CO.

(June 5, 1911. On Rehearing, Oct. 30, 1911.)

*(Syllabus by the Court.)*

RAILROADS (§§ 367, 382*)—INJURY TO PERSON ON TRACK—CONTRIBUTORY NEGLIGENCE.

A switch foreman, handling cars in a space which is practically given up to such use, and who has caused three cars to be placed upon a track within two or three feet of a bulkhead or "bumper," cannot be held to have been at fault in failing to anticipate that within a few minutes elapsing whilst he was bringing in two other cars to be coupled to the three so placed a girl of 14 would interpose her person between the end car of the three and the "bumper," such action being shown to have been wholly unnecessary and unusual and highly dangerous; and there can be no recovery of damages for injuries sustained by the child, by reason of the movement of the cars incident to the coupling.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1257, 1258, 1297–1304; Dec. Dig. §§ 367, 382.*]

Appeal from Twenty-Eighth Judicial District Court, Parish of Jefferson; P. E. Edrington, Judge.

Action by Frances Buhler, widow of James Boyle, individually and as tutrix of Hilda Boyle, against the Morgan's Louisiana & Texas Railroad & Steamship Company. Judgment for plaintiff, and defendant appeals. Suit dismissed.

Alfred E. Billings, for appellant. L. H. Marrero, Jr., L. Robert Rivarde, and Conrad A. Buchler, for appellee.

PROVOSTY, J. Alongside of the entire length of the Southern Oil Company's Mill at Gretna is a platform about three feet from the ground, and inclining to the ground at one end. Alongside of this platform, about 18 inches from it, is a switch track of the defendant company. This switch track goes no further than the toe of this incline, where a bumper arrests the cars and prevents their running off. This bumper consists of a mound of earth about three feet high and five to six feet in diameter. Alongside of this switch track is the main track and other switch tracks of the defendant company, forming a network of tracks. On this network of tracks, cars are almost constantly being switched. A switching engine had just placed three box cars next to the platform on the switch track, and had gone back to the main track for two more box cars to be put on the switch track and connected with the three already there, when the little daughter of the plaintiff, aged 13 years, 5 months, and 12 days, met with the accident upon which the present suit in damages is based. She testifies that she had brought the midday meal of her sister, who worked at the mill, and that she was sitting with another girl in a window opposite the opening between the bumper and the end box car, waiting for her sister to get through eating dinner, when she saw a piece of sulphur on the ground in front of her, be-

tween the switch track and the main track, and that, wishing to get this piece of sulphur, she left her seat and walked across the platform, and jumped to the ground, and was crossing the switch track between the box car and the bumper when the box car came upon her suddenly (as an effect of the switch engine having come with two box cars and bumped against the three stationary cars), and pinned her against the bumper, and crushed her leg. She testifies that when she went upon the track she saw the switch engine about half a block away, going from her, and that she did not know that the two cars which bumped against the three cars had been "turned loose" by the engine; that she did not see them.

The conclusion from this testimony would be that the coupling was made by the process known as a "running switch," or "kicking the cars"; but such was not the fact; the coupling was made slowly and carefully, and the only negligence sought to be imputed to the defendant company was that there was not a brakeman at the end of the stationary cars to make sure that no one was between them and the bumper.

We do not think that such obligation rested upon the defendant company. Railroad employés engaged in switching, who have just placed cars within two or three feet of a bumper, have a right to assume that they may safely make a coupling to such cars without going to the end of the cars to ascertain whether, in the few intervening minutes, some one has not come and interposed his person between the cars and the bumper.

Especially is this so when, as in this case, any one wishing to go to the other side of the track could do so just as readily by going around the bumper as between it and the cars.

The defendant company was guilty of no negligence. Plaintiff's little daughter, on the other hand, was guilty of the grossest negligence, and has but herself to blame for the misfortune that has befallen her.

Judgment set aside, and suit dismissed, at plaintiff's cost.

SOMMERVILLE, J., takes no part herein.

## On Rehearing.

MONROE, J. The earnest and able argument of plaintiff's counsel on rehearing has failed to convince the court that there was any error in the conclusion heretofore reached in this case that defendant should not be held liable in damages for the injury here complained of. The place where the accident occurred was not a public crossing, and was not used as such; it was not a place where children or other people assembled, or had any reason to assemble; and the circumstances were such that the switch foreman, who directed the movements of the cars by which the injury was inflicted, had no reason to anticipate that the person injured would place herself where she did; such action having been wholly unnecessary and unusual and highly dangerous. The locus in quo had been a public road, but, as it lies between the main plant of the oil company and its lard plant, the police jury, in consideration of the opening of a new public road by the oil company upon the other side of the lard plant, had authorized the old road to be covered with railroad tracks, for the convenient handling of the product of those plants. Whether it was legally competent for the police jury to grant such authority is immaterial for the purposes of this case. The fact is when the accident occurred there were five tracks between the lard plant and the main plant, and what with the inequalities in the surface of the ground between the tracks and the rails rising above the surface of the tracks themselves the place was practically unfit for any other use than the handling of cars, and we fail to find in the evidence that it was used for any oth-

er purpose. The employés in the lard plant and those who brought their meals had no occasion to cross the tracks, and did not do so. Chauncy Trauth, a witness for plaintiff, on his direct examination, testified as follows:

"Q. Was that incline used frequently by people going in there? A. Yes, sir; it was always used. [Referring to the incline running down from the platform which extended along the side of the lard plant and between it and the spur track where the accident occurred.] Q. And the people going up this incline and going into the lard plant, were they in the habit of crossing this spur track? A. No, sir; they came straight up. Q. Did they some time cross this track? A. Not that I know of."

Leah Fink, a witness for plaintiff, who had carried her brother's dinner to the plant, as Hilda Boyle had carried her sister's, had overtaken Hilda on the way, and accompanied her, was standing with her upon the incline a moment before she went upon the track, and witnessed the accident, was interrogated by plaintiff's counsel, and answered as follows:

"Q. Was it usual for you and the other people carrying meals there to wait on this incline and platform until the parties had completed their dinner? A. Yes, sir. Q. It was usual for you to do that? A. Yes, sir. Q. I wish you would state whether or not it was usual to cross this track near this bulkhead, going on and off this incline? A. No, sir; it wasn't usual. Q. Well, did you ever cross right there by the bulkhead? A. I never did. Q. Did you ever see anybody else cross there? A. The workmen. Q. You have seen workmen cross there? A. Yes, sir."

On cross-examination:

"Q. Where did you say that you met Hilda Boyle? A. On the road. Q. She was ahead of you? A. She was ahead of me. Q. And you caught up with her? A. Yes, sir. Q. Which way did you come? A. Up the front way. Q. What do you mean by that? A. On the road. Q. You didn't go up the levee at all? A. No, sir. Q. Did you ever cross this track in order to get into the lard plant? A. We passed along the track. Q. Did you cross it? A. No, sir. Q. Did she cross it to go in where her sister was? A. No, sir. Q. Didn't you have to cross, or didn't you cross, all of these tracks, and didn't she cross all of these tracks to get in there? A. No, sir. Q. You are positive of that? A. Yes, sir."

Hilda Boyle had testified that she had to cross the tracks, and did cross them. Harry Le Blanc (an employé, at the time that he testified, of the Union Oil Company, but, at the time of the accident, working in the lard plant of the Southern Oil Company), called as a witness for defendant, testified as follows on cross-examination, to wit:

"Q. Do you know whether it was customary for the employés of that lard plant to cross this switch track in going into the lard plant? A. I don't think. * * * Q. Didn't they cross in front of this bulkhead usually in going into this lard plant? A. No, sir. Q. Did you ever see them do it? A. No, sir."

Mr. Snypp, superintendent of the Southern Oil Company, called as a witness for defendant, gave the following testimony:

"Q. If a person were going from Gretna to the lard plant, to take dinner to one of the inmates there, would they have to cross any track in your yard, in order to go up that incline, to go into the lard plant? A. No, sir."

It is quite likely, as Leah Fink says, that those who brought dinners to the employés of the lard plant waited, in mild weather, on the incline and platform for the vessels that they were to take home with them; but there is not a syllable of testimony to the effect that any of them ever assembled on the tracks, or that any one person ever stood or waited on the tracks, for a moment. Under such circumstances, defendants' switch foreman, who had caused three cars to be left on the spur track, could have had no reason for anticipating that within the five minutes that elapsed while he was bringing in the other two cars the little girl who was injured would interpose her person in the two or three foot space between the bulkhead and the car nearest to it, since for any one to do so was wholly unnecessary and unusual and, as the event proved, highly dangerous.

The judgment heretofore rendered is therefore reinstated and made the final judgment of the court.